UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
NEW YORK
-------------------------------------------------------------
TRUSTEE OF THE FIND ME INK TRUST and
CALVIN FAN, trustee and individually

                            *Plaintiffs*,

          -against-                      **DEFENDANTS' MOTION IN LIMINE NOS. 1-3**

RICHARD HECKER, TRACTION &
SCALE LLC, HECKER CONSULTANCY,
LLC, and
DOES 1-10                                          1:18-cv-06779-DLI-JO

                            *Defendants*.
-------------------------------------------------------------

I.    **MOTION IN LIMINE NO. 1: EXCLUDE EVIDENCE, TESTIMONY AND ARGUMENT THAT DEFENDANT HECKER'S STATEMENTS ABOUT THE VALUE OF TATTOO TECHNOLOGIES, INC. ("TTI") ARE RELEVANT FOR PURPOSES OF ESTABLISHING THE VALUE OF TTI.**

    **Introduction**. One of Plaintiffs' damages theories is that Defendants through their alleged actions caused the devaluation of Plaintiffs' stock in the underlying company, Tattoo Technologies, Inc. ("TTI" or, the "Company"). Accordingly, this requires Plaintiffs to establish through competent and admissible evidence what the value of the Company was prior to Defendants' actions, and how much the Company's value declined as a result of those actions.[1]

---

[1] *Measurement of Damages in Private Actions Under Rule 10b-5*, at 172-173, Washington University Law Review, Vol. 1968 (Jan. 1968); see also,

1

Rather than use a valuation expert, Plaintiffs have informed Defendants they intend to give the jury "data points" upon which the jury can decide what the Company's valuation was before and after Defendants' alleged wrongful conduct, and how much Defendants' alleged wrongful conduct contributed to the alleged depreciation. Several of Plaintiffs' purported "data points" are statements by Defendant Richie Hecker ("Hecker") as to Hecker's perceived value of TTI which are not admissible under Fed. R.Evid. 701 or 702. While Hecker's out-of-court statements can overcome the hearsay rule as admissions against interest, because Hecker is not a valuation expert (and not been identified as such by Plaintiffs) his statements are inadmissible lay opinion under Fed. R. Evid. 701 and therefore must be excluded.

**Background**. Defendants served contention interrogatories on Plaintiffs requesting that Plaintiffs state all facts on which they base their "Computation of Damages" in their Rule 26 Initial Disclosures. In response, Plaintiffs stated:

*Loss of stock value.*

1. *Early Valuations by Richie (table, emails, payout attempts).*

2. *Crowdfunder's different valuation.*[2]

In the same contention interrogatories, Defendants further requested Plaintiffs "identify all documents which you based your 'Computation of damages'" as set forth in Plaintiffs' Initial Disclosures. Plaintiffs identified the following documents:

*Loss of stock value*

1. *Valuations by Richie: Hecker Depo. e.g. at 74-75. Exhibit 48, 63.*

   *Defendant Hecker's attempts to negotiate payout: Exhibits. 51 to 54.*

---

https://openscholarship.wustl.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=3028&context=law_lawreview.

[2] Benisek Decl., Exhibit A (Plaintiffs' Resp. to Defs' Interrogs. (33FT1.1) & Reqs. Prod. (34FT2.1), at 22-23).

2. *Form C, Exhibit 62. Fruci report used as exhibit for Fan and Mahoney depos (aka CF0000188). Crowdfunder disclosure aka CF0000202.*[3]

What is clear from Plaintiffs' discovery responses is that Plaintiffs intend to use statements by Hecker in deposition and e-mails to establish the value of TTI at given moments in time. For example, in Exhibit 63 identified by Plaintiffs as "Valuations by Richie", Defendant Hecker writes at the top of the e-mail chain:



As discussed below, this type of naked statement is not admissible to establish value of the underlying Company because Hecker's statement does not qualify as permissible lay opinion testimony under Fed. R. Evid. 701, nor was the statement identified and/or established as expert testimony under Fed. R. Evid. 702.

**Legal Standard**. In determining the market value of an asset, a plaintiff can rely on prior income history, expert opinion, evidence of sales of comparable assets, the testimony of the business's owner, and evidence of recent sales or recent offers for the company. *Washington v. Kellwood Co.,* No. 05-cv-10034 (SN), 2016 WL 4619207, at *3 (S.D.N.Y. Sept. 6, 2016) (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000)). In some circumstances, "business owners" may provide lay opinion testimony based on their own knowledge of their company's operations and value. *Washington*, 2016 WL 4619207, at *5. However, Fed. R. Evid. 701 authorizes lay opinion testimony only when it is "rationally based on the witness's perception,

---

[3] *See id*. at 23-24.

helpful to clearly understanding the witness's testimony or to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge." *Id*. at *5 (citing Fed. R. Evid. 701) (internal quotations omitted). Fed. R. Evid. 701 authorizes:

> [T]he owner or officer of a business to testify to the value or projected profits of the business without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. This testimony is admitted because of the particularized knowledge that the witness has by virtue of his or her position in the business." But owners can give lay opinion evidence only on matters that are within their personal knowledge and experience. Rule 701 assumes that a business owner will draw his or her valuation from an established track record. When a business does not have such a track record, and the business owner has no experience running a similar business, the lay opinion testimony will not be admissible.

*Washington*, 2016 WL 4619207, at *5 (internal citations omitted).

Plaintiffs are clearly hoping to rely on the "business owners" exception to establish the admissibility of Defendant Hecker's statements as to the value of TTI. For the many reasons set forth below, Defendant Hecker's statements are not admissible lay opinion as to the value of TTI.

**Discussion**. Defendant Hecker's statements about the potential value of TTI are not admissible as lay opinion under the business owner exception for several reasons. First, Defendant Hecker does not qualify as a business owner under the exception. Defendant Hecker held the role of "Chairman" and was a minority shareholder (Hecker was granted approximately fifteen percent (15%) of the common stock of the Company). ECF No. 1, ¶ 26. The Complaint notes at length that Defendant Hecker's only substantial duty "was to work his network of contacts to raise investment for TTI . . . . On occasion, he was asked to perform minor tasks, such as looking up what companies could issue gift cards or brainstorm ideas for public relations, but these were not substantial duties" according to Plaintiffs. ECF No. 1, ¶ 129 (Complaint). Accordingly, Defendant Hecker is not the type of "business owner" contemplated under Fed. R.

4

Evid. 701 that possesses sufficient personal knowledge and experience as the owner to competently opine on the Company's value.

Second, as noted above by the court in *Washington*, when offering a lay opinion about the business's value, Fed. R. Evid. 701 assumes a business owner is basing his valuation on an "established track record." **TTI had no track record**. TTI was not even formed as an entity until July 28, 2016. ECF No. 1, ¶ 149 (Complaint). The e-mail Plaintiffs intend to offer into evidence was written by Defendant Hecker only three months after TTI was even formed (October 4, 2016). Moreover, it is undisputed Defendant Hecker had no prior experience in the tattoo industry.

Defendant Hecker was not the "owner" of TTI. He only played a minor role in the Company's business. The Company had no track record, and Defendant Hecker had no experience running a similar type business. All of these facts render any stray statements about what Defendant Hecker thought TTI could be worth as improper and inadmissible lay opinion under Fed. R. Evid. 701 and Second Circuit precedent. Accordingly, Defendants respectfully request the Court exclude all evidence, testimony and argument related to Defendant Hecker's statement as to value of TTI.

II. **MOTION IN LIMINE NO 2 – EXCLUDE EVIDENCE, TESTIMONY AND ARGUMENT THAT A "VALUATION CAP" IS EVIDENCE OF THE VALUE OF TATTOO TECHNOLOGIES, INC.**

As discussed above, Plaintiffs intend to ask the jury to determine the value of TTI before and after Defendants' alleged wrongful conduct by providing the jury with certain "data points." One of these "data points" is a "**valuation cap**" contained in certain company finance documents. The problem is that a "valuation cap" is not competent evidence of TTI's value at any particular time. Moreover, even if a "valuation cap" could be considered a relevant "data

point" in deciding the underlying value of TTI, explaining a "valuation cap" and arguing why it should be considered suggestive of TTI's valuation easily treads into the realm of expert testimony and the requirements of Fed. R. Evid. 702, none of which Plaintiffs have complied with.

Through the exclusive efforts of Defendant Hecker, TTI raised several hundred thousand dollars to seed the Company's initial operations. All of the investors invested through an investment vehicle called a SAFE – Simple Agreement (for) Future Equity. A SAFE is a contract that allows investors to invest money into a company with the expectation the investment will be later converted into preferred stock when the company raises a "priced round." Below are excerpts from a SAFE on Plaintiffs' exhibit list including the "valuation cap" contained therein:

> **TATTOO TECHNOLOGIES, INC.**
>
> **SAFE**
> **(Simple Agreement for Future Equity)**
>
> THIS CERTIFIES THAT in exchange for *the reduction in compensation due under the Website and Mobile Applications Development Agreement dated August 19, 2016 between the Investor and the Company,* **Jynglee Internet Services Ltd**, a Cyprus company having a principal place of business at Lapithou Street, 11, Egkomi, 2410, Nicosia, **Cyprus** (the "**Investor**") of $25,000.00 (the "**Purchase Amount**") on or about **November 3, 2016**, Tattoo Technologies, Inc., a Delaware corporation, having a principal place of business at 529 West 42nd Place, Chicago, Illinois 60609 (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's capital stock, subject to the terms set forth below.
>
> [IF USING CAP] The "**Valuation Cap**" is $2,800,000.00.
> [IF USING DISCOUNT] The "**Discount Rate**" is 100%. [meaning no discount is to be applied]
> See **Section 2** for certain additional defined terms.
>
> 1. *Events*
>
>    (a) **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of SAFE Preferred Stock equal to the Purchase Amount divided by the Conversion Price.
>
>    In connection with the issuance of SAFE Preferred Stock by the Company to the Investor pursuant to this Section 1(a):

> "**Liquidity Price**" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

> "SAFE" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.
>
> "SAFE Preferred Stock" means the shares of a series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.
>
> "SAFE Price" means the price per share equal to **the Valuation Cap divided by the** Company Capitalization.

ECF No. 1-47 (SAFE).

The "valuation cap" in ECF No. 1-47 is for $2.8 million and represents the figure used to calculate the particular SAFE investor's "SAFE Price" for the shares he or she <u>may</u> receive <u>if/when</u> the Company raised money in the future through a "priced" preferred equity finance round.[4] Per the express terms of the SAFE agreement, the Valuation Cap represents the highest price a SAFE investor will pay for shares of preferred stock in the next "priced" round potentially years later, but it does not reflect the actual value of the Company as the Company may turn out to be worth much less or much more than the valuation cap figure. It could be that TTI negotiated a favorable deal and convinced investors to agree to high "valuation cap" which the Company's actual valuation would not have surpassed at the next "priced" equity financing. Conversely, it is possible the SAFE investors negotiated a more favorable deal and convinced the Company to agree to a low "valuation cap" which the Company's actual valuation would have easily surpassed at the next "priced" equity financing. It is simply unknown. Moreover, the Company went out of business before it ever attempted to conduct a "priced" equity financing, so it is literally unknown whether the "valuation cap" in the Company's SAFE agreements were above or below the Company's actual valuation.

---

[4] *See, e.g.*, https://techcrunch.com/2017/09/06/cap-tables-share-structures-valuations-oh-my-a-case-study-of-early-stage-funding/ (Techcrunch article explaining basics of early stage financing and the distinction between a "priced" financing round, and "unpriced" financing round).

Plaintiffs have suggested during the litigation that, in their opinion, a "valuation cap" is an indication of the Company's value and thus relevant to determining the Company's value at a particular time. For example, Plaintiff Calvin Fan testified in deposition that in his opinion a "valuation cap" is supposed to represent the value of the company close to the time of the sale:

> I think that the valuation is the price that would be paid for the company on an open market, arm's length transaction, with a valuation cap that can be -- that can be a term used in different ways. But an example is with an investment where the value of the investment will vary depending on what the value of the company is relative to the valuation cap. They're not completely unrelated. You'd be foolish to buy an investment with the valuation cap of 2.8 million. And if you believe that the company was worth $10,000, there is a relation between the two. The expectation is that the company -- that the company's value should be greater than the valuation cap. ***And the valuation cap should be set somewhat around the valuation of the company at the time of the sale of the investment***.

Benisek Decl., Exhibit B (Deposition of Calvin Fan ("Fan Dep. Tr.") at 62:1-16).

The problem with Mr. Fan's opinion is that it is not based on personal knowledge of what actually happened with TTI and the SAFEs the Company sold to various investors. Mr. Fan has filed his witness list and no investor is appearing at trial to testify that the "valuation cap" actually represented the value of the Company, in the investor's belief, at the time of the transaction. Nor has Mr. Fan in his discovery responses identified evidence that the valuation cap used by the Company was actually meant to represent the value of the Company at the time of the transaction. Indeed, he testified at deposition that he did not know how Mr. Hecker came up with $3.5 million valuation cap or purported valuation. Benisek Decl., Exhibit B (Fan Dep. Tr. 145:1-146:2). Moreover, contrary to Mr. Fan's opinion on how "valuation caps" "***should***" work, the venture capital investment community does not apparently agree. There are literally dozens, if not hundreds, of websites and legal and venture capital blogs explaining "valuation caps."[5]

---

[5] See, e.g., https://en.wikipedia.org/wiki/Simple_agreement_for_future_equity_(SAFE); https://legalvision.com.au/q-and-a/what-is-a-valuation-cap/; https://help.wefunder.com/deal-terms/295252-valuation-cap; https://www.startuplawblog.com/2014/02/21/what-is-a-valuation-

While all agree that a "valuation cap" represents the highest price a SAFE investor will convert into the underlying companies next "priced" equity financing, none agree with Mr. Fan's opinion that the "valuation cap" is also supposed to represent the value of the underlying company at the time of the investment. The point of this is that it is improper for Mr. Fan to offer his lay opinion and speculate as to the meaning of a "valuation cap" beyond the definition of "valuation cap" in the SAFEs themselves.

This is a self-created problem for Plaintiffs. Plaintiffs could have retained an expert on venture capital investing to explain the nuances of SAFE investments and how "valuation caps" may inform the underlying value of a company, or conversely, Plaintiffs could have solicited the testimony of investors to confirm when they invested their money in TTI through SAFE agreements that they viewed the "valuation cap" as synonymous with the value of the Company at the time of the transaction. Plaintiffs chose neither, instead hoping Mr. Fan could opine that in his lay view a "valuation cap" "***should***" reflect the value of the underlying company at the time of the transaction. This is not proper lay opinion under Fed. R. Evid. 701, or is it undisclosed and improper expert opinion under Fed. R. Evid. 702.[6] In either case, the Court should exclude all evidence, testimony and argument that the "valuation cap" contained in TTI's SAFE investments is indicative of TTI's value at any given time.

### III. <u>MOTION IN LIMINE NO 3</u> – EXCLUDE EVIDENCE, TESTIMONY AND ARGUMENT OF DAMAGES NOT DISCLOSED IN PLAINTIFFS' CONTENTION INTERROGATORY RESPONSES.

For several categories of damages, Plaintiffs identified specific theories, facts, and documents supporting their alleged categories of damages. However, in some instances,

---

cap/#_ftn1; https://www.danshapiro.com/blog/2012/09/a-cap-is-not-a-valuation/; https://www.seedrs.com/learn/help/valuation-cap.

[6] Indeed, had Plaintiffs at least designated Mr. Fan's testimony as "expert" under Fed. R. Evid. 702, Defendants would have had the opportunity to retain and submit rebuttal expert testimony

Plaintiffs simply "hand waived" in their responses stating they were still looking for the relevant documents. For example, with respect to alleged damages caused by TTI hiring Jynglee, Plaintiffs state "there are burn rate figures that I cannot find right now." However, since serving this response in February 2019 at the close of discovery, Plaintiffs have never updated these responses pursuant to Rule 26(e):

> **Defendants' Interrogatory 21: Identify all documents** which you base your "**Computation of Damages**" as set forth in section (iii) on pages 4-5 of Plaintiffs' Initial Disclosures. To identify documents you may either identified the bates number and/or range of the document, or follow Section A.1. of the Instructions and Definitions above.
>
> *Response*: Subject to the General Objections, the Plaintiffs respond
> A. Loss of stock value
>    1. Valuations by Richie: Hecker Depo. e.g. at 74-75. Exhibit 48, 63.
> B. Damage caused by Jynglee: Hecker and Mahoney Depos. and (within the universe of documents there are burn rate figures that I cannot find right now).
> C. Apportionment of blame: Hecker Depo. at 119; Mahoney Depo. (creating leverage).
> D. Hecker Depo. e.g. at 215-220, Mahoney Depo.

Benisek Decl., Exhibit A ((Plaintiffs' Resp. to Defs' Interrogs. (33FT1.1) & Reqs. Prod. (34FT2.1), at 23-24). Pursuant to Fed. R. Civ. P. 26, 37, and basic principles of fairness, Plaintiffs should not be permitted at this late stage in the proceeding to introduce document evidence or testimony not specifically identified in Plaintiffs' discovery responses. Defendants have prepared to meet Plaintiffs case based on their responses to contention interrogatories and to allow Plaintiffs to sandbag Defendants at this late date would be prejudicial and unfair. Accordingly, the Court should exclude evidence and theories related to Plaintiffs' damages case not disclosed in Plaintiffs' contention interrogatory responses.

Respectfully submitted,

Dated: September 9, 2019
Walnut Creek, CA
94596

By: _____
   Eric W. Benisek
   Vasquez Benisek & Lindgren LLP
   1550 Parkside Drive, Suite 130
   Walnut Creek, CA 94596
   ebenisek@vbllaw.com